CUYAHOGA COUNTY BAR ASSOCIATION *v.* JURCZENKO.

[Cite as *Cuyahoga Cty. Bar Assn. v. Jurczenko,*
114 Ohio St.3d 229, 2007-Ohio-3675.]

(No. 2007–0069—Submitted February 28, 2007—Decided July 25, 2007.)

---

**Per Curiam.**

{¶ 1} Respondent, Alexander Jurczenko of Cleveland, Ohio, Attorney Registration No. 0030918, was admitted to the practice of law in Ohio in 1973.

{¶ 2} On August 24, 2005, we suspended respondent's license to practice for two years, staying the second year on conditions, because he committed professional misconduct, including neglect of clients' cases, failure to refund or account for legal fees, and failure to cooperate in the investigation of this misconduct. *Cuyahoga Cty. Bar Assn. v. Jurczenko,* 106 Ohio St.3d 123, 2005-Ohio-4101, 832 N.E.2d 720. Respondent did not comply with our order of suspension and then failed to appear and show cause why he should not be found in contempt. We found respondent in contempt, revoked the stay, and ordered respondent to serve

the entire two-year suspension. We also sentenced respondent to serve seven days in jail, but suspended the sentence on the condition that he comply with our August 24, 2005 order within 30 days. *Cuyahoga Cty. Bar Assn. v. Jurczenko,* 110 Ohio St.3d 1449, 2006-Ohio-4000, 852 N.E.2d 195.

{¶ 3} The Board of Commissioners on Grievances and Discipline has recommended that we now permanently disbar respondent based on findings that he committed a multitude of newly discovered violations of the Code of Professional Responsibility and the Rules for the Government of the Bar. On review, we adopt the board's findings, and in view of his disciplinary record, a permanent disbarment is now warranted.

### Disciplinary Proceedings

{¶ 4} Relator, Cuyahoga County Bar Association, charged respondent with 21 counts of professional misconduct involving 17 clients over a period spanning 1989 through 2006. Two separate complaints were filed. The first complaint was filed by relator on August 8, 2005. In that case, No. 05–065, respondent retained counsel, answered the complaint as twice amended, and participated with the benefit of counsel in various prehearing conferences and other preliminary proceedings. Respondent later discharged his counsel, and at a February 20, 2006 prehearing conference, participated pro se. He was granted time to find a new attorney, but he did not retain new counsel. Instead, respondent continued to participate pro se in the board proceedings—taking part in another prehearing conference and intermittently sending e-mails and facsimiles. On order of the panel chair, respondent submitted to two psychological examinations conducted by relator's expert, Donald J. Weinstein, Ph.D., who diagnosed respondent with alcoholism and a "major depressive disorder." Respondent did not, however, appear for five scheduled depositions.

{¶ 5} Relator filed the second complaint on June 9, 2006, and amended it on June 22, 2006. In that case, No. 06–044, relator attempted to serve notice of an amended complaint by certified mail at the last two known addresses for respondent, those at which he had asked to be served and at one of which he had accepted service before, but he did not claim the notices. On July 10, 2006, case Nos. 05–065 and 06–044 were consolidated with no objection from respondent. On August 21, 2006, relator served the amended complaint pursuant to Gov.Bar R. V(11)(B) on the clerk of the Supreme Court as respondent's agent for service.

{¶ 6} The assigned three-member panel heard the cases together on September 14 and 15, 2006. Respondent sought a continuance of the hearing several days beforehand, but the panel chair denied his request. Respondent did not appear at the panel hearing and has not made any appearance in this case since then.

## Misconduct

{¶ 7} In the two cases heard by the panel, some of the 17 clients suffered more financial damage than others. We will focus on five of these cases that demonstrate respondent's inability to practice law in accordance with ethical standards. These cases also represent respondent's pattern of victimizing clients and amply justify his disbarment.

### The Dilley Case

{¶ 8} This case involves the misappropriation of at least $26,000 from a client.

{¶ 9} In November 1989, Gary Dilley paid respondent $10,000 to defend him against a tax-lien lawsuit filed by the state of Ohio. Dilley later paid respondent $5,000 to file personal bankruptcy on his behalf. In December 1991, respondent had Dilley draft a check, payable to respondent, for $26,000. Dilley provided this check with the understanding that the money could be used, if necessary, to pay the sales tax that the state claimed he owed, with interest and penalties. Respondent promised to hold the check in escrow and told Dilley that this would show good faith and prevent the state from following up on liens and taking Dilley's house. Respondent deposited the check in his client trust account.

{¶ 10} In the ensuing years, respondent led Dilley to believe that the state had withdrawn all claims and that Dilley had never had to go into bankruptcy. Dilley repeatedly asked about getting back the $26,000, but respondent replied that Dilley would lose his home if respondent did not keep the money "in escrow." Respondent never returned Dilley's $26,000.

{¶ 11} Dilley finally hired a new lawyer. Apparently with his new lawyer's assistance, Dilley learned that tax liens were still pending and that he still owed those amounts, including penalties and interest. Dilley has never been able to recover his money or his file.

{¶ 12} By lying about and misappropriating Dilley's money, respondent violated DR 1–102(A)(4) (prohibiting conduct involving dishonesty, fraud, deceit, or misrepresentation), 1–102(A)(5) (prohibiting conduct prejudicial to the administration of justice), 1–102(A)(6) (prohibiting conduct that adversely reflects on a lawyer's fitness to practice law), 7–101(A)(1) (prohibiting a lawyer from intentionally failing to seek a client's lawful objectives), 7–101(A)(2) (prohibiting a lawyer from intentionally failing to carry out a contract of employment), 7–101(A)(3) (prohibiting a lawyer from intentionally causing his clients prejudice or damage), 9–102(A)(2) (requiring a lawyer to preserve the identity of client funds), 9–102(B)(3) (requiring a lawyer to appropriately account for client funds in his possession), and 9–102(B)(4) (requiring a lawyer to promptly pay or deliver to the client funds, securities, or other properties to which the client is entitled).

*The Mysyk Grievance*

{¶ 13} Ronald Mysyk hired respondent to file a Chapter 13 bankruptcy on his behalf. Respondent filed a bankruptcy petition for Mysyk in June 1999, promising to negotiate payments to discharge Mysyk's debts and also to negotiate a compromise with the IRS in a pending tax dispute. Over the succeeding several years, respondent filed two other bankruptcy cases for Mysyk. All three were dismissed because of various failings by respondent. The bankruptcy court reinstated the third petition in November 2004.

{¶ 14} Respondent instructed Mysyk to pay $1,250 monthly to the bankruptcy court, rather than toward arrearages owed on two mortgages, and wrongly assured him that these payments would take care of everything. As of the September 2006 panel hearing, Mysyk had paid $26,000 into the court.

{¶ 15} In March 2006, Mysyk hired new counsel to oversee his bankruptcy. Testifying before the hearing panel, the new lawyer described Mysyk's bankruptcy as "in shambles" and a "nightmare" in which Mysyk was "years behind" in his mortgage payments. Because of this delay, Mysyk's creditors had been able to pursue foreclosure on two properties, one of which was eventually sold at a sheriff's sale. Respondent's delay in the Mysyk bankruptcy also caused Mysyk more than $11,000 in forbearance payments, assessed fees, and expenses.

{¶ 16} Respondent failed to return Mysyk's files after numerous requests. Respondent also failed to reveal his August 2005 suspension from the practice of law.

{¶ 17} By failing to pay Mysyk's creditors and mishandling his bankruptcy, respondent violated DR 1–102(A)(5), 6–101(A)(2) (prohibiting a lawyer from handling a legal matter without adequate preparation), 6–101(A)(3) (prohibiting neglect of an entrusted legal matter), 7–101(A)(1), 7–101(A)(2), and 7–101(A)(3). Because respondent did not advise Mysyk of his suspension, he further violated Gov.Bar R. V(8)(E)(1)(a), (b), and (c) (listing the duties of a suspended attorney).

*The Wojtkiewicz Grievance*

{¶ 18} Respondent misappropriated at least $13,500 in settlement proceeds from Joseph and Patricia Wojtkiewicz, after the couple hired him to file bankruptcy and pay their creditors with the money.

{¶ 19} Respondent filed a personal bankruptcy petition for the Wojtkiewiczes under Chapter 13 in April 2002. As part of that proceeding, respondent promised to negotiate "redemption and composition" payments to various creditors from the proceeds another attorney had obtained on the couple's behalf from settlement of a personal-injury claim. The clients authorized their personal-injury attorney to transfer $22,500 by check to respondent, and on January 31,

2003, respondent deposited the check in his client trust account. The personal-injury lawyer also transferred a check for $1,200 in legal fees to respondent.

{¶ 20} The bankruptcy court dismissed the Wojtkiewicz bankruptcy petition in August 2002 for want of prosecution. Respondent never advised his clients of the involuntary dismissal, and the Wojtkiewiczes continued to receive calls from creditors. Respondent apparently paid approximately $9,000 to one creditor, whom the couple had owed for a van.

{¶ 21} Respondent did not return the Wojtkiewiczes' $22,500 check, less the amount paid for the van, or account for the $1,200 that the couple had paid him in legal fees. Respondent also never told his clients of his suspension. Moreover, respondent failed to respond to relator's investigative inquiries about the Wojtkiewicz grievance.

{¶ 22} By failing to pay the Wojtkiewiczes' creditors and then misappropriating their money from the personal-injury settlement, respondent violated DR 1–102(A)(4), 1–102(A)(5), 1–102(A)(6), 6–101(A)(2), 6–101(A)(3), 7–101(A)(1), 7–101(A)(2), 7–101(A)(3), 9–102(A)(2), 9–102(B)(3), and 9–102(B)(4). By failing to advise his clients of his suspension and ignoring relator's investigation efforts, respondent violated Gov.Bar R. V(8)(E)(1)(a), (b), and (c) and V(4)(G) (requiring a lawyer to cooperate in an investigation of misconduct).[1]

### The Pavlik Case

{¶ 23} Respondent took more than $13,000 in monthly mortgage payments from Peter Pavlik as part of a purported court-approved payment plan in a personal bankruptcy case.

{¶ 24} Pavlik retained respondent, paying him $1,700 to avoid foreclosure on his home, and respondent filed the bankruptcy case on January 12, 2005. Pavlik agreed to continue to pay his monthly mortgage payment of $1,810. But respondent instructed Pavlik to pay $1,810, or however much more Pavlik could afford, directly to respondent. Respondent promised Pavlik that he would pay the mortgagee, Wells Fargo Bank.

{¶ 25} On June 28, 2005, the bankruptcy court dismissed Pavlik's bankruptcy petition for Pavlik's failure to comply with his payment plan, although by September 10, 2005, Pavlik had paid respondent more than $13,000. Pavlik eventually discovered that respondent's license had been suspended and that

---

1. Relator alleged that respondent had also violated DR 1–102(A)(2) (attempting to circumvent the prohibitions of a Disciplinary Rule through the actions of another) by offering to repay the Wojtkiewiczes if they withdrew their grievance or refused to cooperate in relator's investigation. The board found this violation, but because Joseph Wojtkiewicz could not recall this impropriety during the hearing, we do not.

respondent had not deposited any of the mortgage payments to pay the bank. At one point respondent promised to return Pavlik's money, but did not.

{¶ 26} By misappropriating Pavlik's mortgage payments and failing to properly represent him, respondent violated DR 1–102(A)(4), 1–102(A)(5), 1–102(A)(6), 6–101(A)(3), 7–101(A)(1), 7–101(A)(2), 7–101(A)(3), 9–102(A) (requiring a lawyer to deposit unearned fees and client funds into a client trust account), and 9–102(B)(4).[2]

### The Manav Case

{¶ 27} Respondent misappropriated at least $20,000 in settlement funds from Ali Manav.

{¶ 28} Manav, a partner in a steel-processing company, hired respondent to pursue settlement negotiations in a federal civil suit filed by one of the company's creditors. Manav paid respondent $4,500. The parties agreed to a settlement that required Manav to pay $20,000 to the creditor. On respondent's promise that he would pay the settlement, Manav arranged for the $20,000 to be wire-transferred on August 11, 2005, to respondent's client trust account.

{¶ 29} In early 2006, Manav learned from the district court that the creditor had refiled the suit because respondent had never paid the $20,000 settlement. Manav thereafter tried repeatedly to contact respondent but never reached him. In February 2006, Manav explained to the district court that he had paid respondent the settlement proceeds, that he had recently discovered that respondent had been suspended from practice, and that he needed time to find out what had happened to the $20,000 he gave respondent.

{¶ 30} Manav hired new counsel, who negotiated a reduced settlement of $6,000 and an agreement for additional payment from any eventual recovery from the Clients' Security Fund. Manav also paid this amount. Neither Manav nor his new lawyer ever found out what happened to Manav's $20,000. Manav has since filed a claim for $24,500 with the Clients' Security Fund.

{¶ 31} Respondent never disclosed his suspension from the practice of law to Manav. He failed to return Manav's file on request. He also did not respond to investigative inquiries after Manav filed his grievance.

{¶ 32} By misappropriating the Manav settlement money and failing to return the Manav file, respondent violated DR 1–102(A)(4), 1–102(A)(5), 1–102(A)(6), 7–101(A)(1), 7–101(A)(2), 7–101(A)(3), 9–102(A)(2), 9–102(B)(3), and 9–102(B)(4).

---

2. The board also found respondent in violation of DR 1–104(A) and (B) (requiring a lawyer to carry sufficient malpractice insurance or to obtain his clients' written acknowledgement that he does not) with respect to the Pavlik and other grievances, but respondent did not admit these allegations, and relator did not prove them.

Because respondent did not advise Manav of his suspension and did not cooperate in relator's investigation, he also violated Gov.Bar R. V(8)(E)(1)(a), (b), and (c) and (4)(G).

## Sanction

{¶ 33} When imposing sanctions for attorney misconduct, we consider the duties violated, the actual or potential injury caused, the attorney's mental state, and sanctions imposed in similar cases. *Stark Cty. Bar Assn. v. Buttacavoli,* 96 Ohio St.3d 424, 2002-Ohio-4743, 775 N.E.2d 818. Before making a final determination, we also weigh evidence of the aggravating and mitigating factors listed in Section 10 of the Rules and Regulations Governing Procedure on Complaints and Hearings Before the Board of Commissioners on Grievances and Discipline ("BCGD Proc.Reg."). Id. See also *Cleveland Bar Assn. v. Glatki* (2000), 88 Ohio St.3d 381, 726 N.E.2d 993.

{¶ 34} Respondent repeatedly misappropriated his clients' money in violation of his duty to preserve clients' property. Respondent deceived his clients and abandoned their cases. He also knowingly violated our prior order of suspension. For these breaches of his duty to clients, the public, and the legal profession, disbarment is appropriate. *Medina Cty. Bar Assn. v. Wootton,* 110 Ohio St.3d 179, 2006-Ohio-4094, 852 N.E.2d 175 (attorney disbarred for repeated theft of client funds, dishonesty, great financial harm to clients, and failure to cooperate); *Columbus Bar Assn. v. Moushey,* 104 Ohio St.3d 427, 2004-Ohio-6897, 819 N.E.2d 1112 (accepting legal fees and then failing to carry out a contract for employment is tantamount to theft of client funds and, coupled with neglect, a history of misconduct, and other disciplinary infractions, is cause for disbarment); *Cincinnati Bar Assn. v. Weaver,* 102 Ohio St.3d 264, 2004-Ohio-2683, 809 N.E.2d 1113 (attorney's persistent failure to perform, failure to account for clients' money, neglect of their interests, and failure to participate in disciplinary hearings compels disbarment).

{¶ 35} None of the mitigating factors and all of the aggravating factors listed in BCGD Proc.Reg. 10(B) are present in this case. The only possibly mitigating evidence is that respondent has been diagnosed with alcoholism and a major depressive disorder. The examining psychologist, however, emphatically testified that these conditions did not contribute to cause his misconduct. BCGD Proc. Reg. 10(B)(2)(g) requires this causation for mitigating effect.

{¶ 36} Respondent has a prior disciplinary record, including a suspension and contempt citation, and he misappropriated his clients' money dishonestly and selfishly, which are aggravating factors under BCGD Proc.Reg. 10(B)(1)(a) and (b). Respondent has engaged in a pervasive pattern of misconduct and multiple offenses, did not participate in the disciplinary proceedings, and repeatedly frustrated the process by failing to appear or provide discovery without explana-

tion.   All are aggravating factors under BCGD Proc.Reg. 10(B)(1)(c), (d), (e), and (f).   Furthermore, respondent has shown no contrition for his misconduct, has severely injured multiple trusting clients in financial distress, and has made no restitution to these clients.   See BCGD Proc.Reg. 10(B)(1)(g), (h), and (i).

{¶ 37} For these significant abuses of the privilege to practice law in Ohio, we hereby permanently disbar respondent.   Costs are taxed to respondent.

Judgment accordingly.

MOYER, C.J., PFEIFER, LUNDBERG STRATTON, O'CONNOR, O'DONNELL, LANZINGER and CUPP, JJ., concur.

Ellen S. Mandell, Bar Counsel, Gary Fishman, and Thomas Rein, for relator.